The next case for argument, Case No. 25-1619 from the Western District of Missouri, Novartis Pharmaceuticals v. Catherine L. Hanaway et al. Ms. Ellsworth. Good morning, Your Honors, and may it please the Court, Jessica Ellsworth on behalf of the appellant, Novartis. I'd like to reserve three minutes for rebuttal. This case involves constitutional challenges to a Missouri statute that mandates certain actions by drug manufacturers like Novartis who participate in the federal 340B program. The state law's mandated actions do not take place in Missouri, and they are inconsistent with the balance Congress struck in enacting a uniform nationwide program. They certainly have an effect in Missouri, though, right, Counsel? So, Your Honor, yes, I would agree that there is some effect in Missouri. What I'd like to focus on this morning, from all of the issues that are raised in the briefing, is the extraterritoriality argument under the Dormant Commerce Clause. And the reason I'd like to do so is because, while our appeal was pending, this Court decided a case called Association for Accessible Medicine v. Ellison back in June of last year. The Court's reasoning and analysis in that case directly apply here, and they make this appeal a straightforward one for the Court to resolve in Novartis' favor. In Ellison, this Court held unlawful a Minnesota law that prohibited drug manufacturers from imposing certain price increases on generic drugs that were sold, dispensed, or delivered to consumers in Minnesota. The reason that this Court held that statute violated the Dormant Commerce Clause was that it regulated the drug manufacturers' sales to their wholesalers that took place outside of Minnesota because the drugs ended up in Minnesota later down in the distribution chain. That decision rejects virtually all of the arguments that the state defendants are making in this appeal here, and that may be why the state defendants just ignored that case entirely in their brief. And if I could, I'd like to walk through some of the really, I think, crucial points from the opinion and reasoning in that case. As with this statute, the challenged Minnesota law regulated only manufacturers' conduct. It didn't regulate wholesalers, distributors, or pharmacies. Counselor, it directly regulated price, right? It directly regulated price. Okay. Now, does this statute directly regulate price? This statute does directly regulate price in the same way. Are you sure? Okay. I am sure. Go ahead. Make your argument. Okay. So the first thing I would point to, Your Honor, is that what this statute involves is a 340B drug that is defined in Section 1 of the statute to be a drug that has been subject to an offer for a reduced price. The whole purpose of this statute is that Missouri wanted to expand the amount of reduced-price drugs that are available to Missouri-covered entities. The problem, Your Honor, is that the way it did so was by regulating the manufacturers. And you can see that in Section 2 of the statute. The manufacturers are the ones who face liability for their conduct, either directly or indirectly, interfering with this discounted drug arriving at a contract pharmacy. Okay. It's got other people there it affects, too, right? It does start with pharmaceutical manufacturers. It does. Does the fact that there are other third-party logistics agents, you know what it says. Does that affect your argument? It does not because of the last sentence of that provision, which talks about the wholesale drug distributor not being considered one of those third parties. So the wholesaler is excluded. So what we are looking at here, and Novartis is a drug manufacturer, so Novartis' argument is that this statute directly affects its ability to engage in commerce with its wholesalers and charge the wholesalers the commercial price for those drugs because what Missouri says is that if the drug is later purchased by a Missouri-covered entity for a contract pharmacy, it has to have a reduced price. Of course, Novartis is not in the business of selling pharmacy drugs to covered entities or pharmacies. Its only conduct is its interaction with the wholesaler, and that's what makes this case just like Ellison. In Ellison, the court started with this drug distribution train and recognized that drug manufacturers sell prescription drugs to wholesalers and that it's wholesalers who, in turn, sell them down the line to pharmacies and healthcare manufacturers. There are a few aspects of the analysis in Ellison that I think are really critical here, too. The first is that Ellison recognized that a state law can violate the Dormant Commerce Clause in three ways, one of which is this extraterritoriality argument that we are raising here. So to the extent the state defendants in particular suggest that there is no longer this extraterritoriality argument after the Supreme Court's pork producers decision, this court has already rejected that argument. Second, what this court said in Ellison is that national pork producers distinguished between in-state laws, sorry, laws regulating in-state sales that have a practical effect of controlling interstate commerce and laws that are, in fact, an extraterritorial control on commerce happening outside the state. I think the way to understand these two very nuanced aspects of the law is that the Dormant Commerce Clause is looking at where the regulated conduct is occurring. Is it occurring inside the state or outside the state? The law in pork producers regulated in-state sellers and in-state sales, and the argument was that by regulating those in-state sellers and in-state sales, manufacturers might have to make changes outside of California. But, of course, the regulation here is on manufacturer's conduct, and the manufacturer's conduct, Novartis' conduct here, is its sales to wholesalers which occur out of state. And that is exactly why in Ellison this court held the Minnesota statute unlawful. It had the specific, impermissible, extraterritorial effect of controlling the manufacturer-wholesaler transaction. And it gave a hypothetical that I think is very useful. What the court said was the way this Minnesota law would work is that if a Colorado manufacturer sold drugs to a New Jersey distributor at a price that differed from what the statute said the price should be in Minnesota, then the manufacturer would face liability if the drugs one day ended up in Minnesota. So they said Minnesota was setting the price? They did. Okay. Here, your opponents say, we don't do it, the federal government sets price. So, I think they do that by trying to elide the fact that the price for the same drug can be a commercial price, or it can be a 340B price. And it is true that the government has a formula you use to calculate the 340B price. But when you are looking at the price of the particular unit of drug that is being sold, it is not the federal government that is saying that has to be at a 340B price. It is, in fact, this Missouri statute. That is the whole point, to have more discounted drugs available to Missouri-covered entities. And so, the actual term that is chosen, the actual dollar amount, is the 340B price, but it is Missouri who is saying you must use that price. And that is why I think this is... Well, doesn't the replenishment model say you must use that price? And not Missouri. Your Honor, I don't... I want to make sure I understand your question. I don't really understand replenishment, except I think that what they do is a mild shell game of putting the drug there and then replenishing it with one and using the government price for that and the other price for this. That is what I think it is. Go ahead. I think it is a bit of a shell game, Your Honor. Some shell games are legal, by the way. Go ahead. Some shell games are legal. I think the fact that this shell game goes on tells us that this price discount is really what this statute is all about. Are you really objecting to the replenishment part of this and not to the price part of it? The two go hand-in-hand because the replenishment model is what covered entities and pharmacies have used to get around the way the program operated for decades, which was to have a single contract pharmacy. I think you can tell this, Your Honor. We cite in our reply brief the publicly available database of covered entity pharmacy arrangements. Just to show you how this game is working, there are 14 Missouri covered entities who have signed on contract pharmacies in Honolulu. SSM. Are they back to just having one, though? Did I understand the 28J letters that were back to just having one that you can contract with? Tell me if I misunderstood your 28J. I think it was in the footnote of your 28J. Go ahead. Our policy is the exact way the government interpreted the statute through 2010, which is that a covered entity can have one contract pharmacy. And that is what the federal courts that have looked at this have said is certainly permissible, that the manufacturer's discretion as to how they operate within the 340B program preserves their discretion to have commercially reasonable terms like a one-contract pharmacy policy. Your Honor is right that we submitted, I think it was a motion for judicial notice, we submitted the HRSA decision, the agency that runs the enforcement of the 340B statute, agreeing that there is no overcharge when Novartis operates with its single contract pharmacy policy. So we know it's lawful under federal law. And the question here is whether Missouri can make this federal law subsidy essentially larger for Missouri covered entities. That is what Missouri has tried to do. But it has tried to do so in a way that makes this case problematic for the same reasons that Ellison was. And I think just as Ellison was not a practical effects test under the Dormant Commerce Clause, this one is not either. In both Ellison and here, the conduct regulated by the state is the manufacturer's conduct, which takes place out of state. So you have this out-of-state location of the manufacturer's conduct, and that doesn't change regardless of whether the drug one day crosses the border into Missouri or not. And I would note that under Missouri's statute, it's not even clear that the drug has to ever cross into Missouri. Because if you imagine the scenario we were talking about from the Ellison decision, you have a Colorado manufacturer who sells to a New Jersey distributor. The New Jersey distributor then sends the drug to Honolulu. That drug has never come into Missouri. And yet, if that pharmacy in Honolulu has entered into some sort of contract with a Missouri covered entity, then the shell game that Your Honor referenced can occur. And the covered entity and the Honolulu pharmacy and whoever they hire to help them do this matching process can split the difference of the subsidy amount that that unit of drug has triggered. I see that I'm into my rebuttal time, so I'm happy to answer questions or else we'll save the remainder of my time. You may reserve your time. Thank you, Your Honor. Mr. Capozzi. Good morning, Your Honors. Louis Capozzi, Solicitor General of Missouri, appearing on behalf of the state. May it please the Court. The federal 340B program ensures that low-income Americans have access to affordable prescription drugs. In pursuit of that mission, 340B health care provides- No, although there is a strict screening program to determine that-  Yeah, a provider will only be eligible if they serve low-income patients. Also. Right. But that doesn't go sale by sale. You don't have to show income to get the drug, right? No. Or anything like it. The testing is for the provider, not for the patient.  Proceed. Yeah. In pursuit of the mission of making drugs available to poor Americans, 340B health care providers partner with pharmacies who distribute drugs to poor Missourians. These partnerships are especially important to those who live in rural areas and might not live close to a 340B provider. In response, Apelli, Novartis, and other drug manufacturers have tried to stop 340B providers from contracting with pharmacies. Missouri, like more than 20 other states, moved to prohibit such efforts by enacting SB 751. Understandably, Novartis does not like laws like SB 751. Novartis wants the 340B program to reach as narrowly as possible because it does not want to sell drugs at the federally set 340B price. The court should reject Novartis' Dormant Commerce Clause challenge and its preemption theory. I will address the Dormant Commerce Clause. Mr. Connolly- Please address Ellison. Yes, Your Honor. Pretty quickly. I will start- I will start with Ellison. Was Ellison in any of the briefs? It was. So the intervener defendant addressed it in its appellate brief. We addressed the district court decision. So it wasn't in any of the state's brief? We addressed the district court decision, but I will respond to Ellison here. Ellison is easily distinguished because the Minnesota law set prices for out-of-state transactions. That's what makes this case different. Missouri does not set prices. The federal government sets prices. That fundamental fact is what distinguishes both Ellison and the other cases like Stasinski that appellant cites. The federal government sets the price. SB 751 merely requires delivery. In fact, this court considered a similar argument from PhRMA, which is Novartis' trade association, in the McLean case. There was a whole section of the PhRMA brief arguing that the materially identical Arkansas statute regulated price and not delivery. This court expressly disagreed and said statutes like SB 751 only regulate delivery. It is the federal government that regulates price. Okay. I'm a little confused by the judicial notice 28J letter. Does the state say that that means that a provider in Missouri can only contract with one pharmacy? No, Your Honor. Even though the federal government has said that they can put that in their contracts? So what the federal government has said is that that is a legal policy. Federal law does not prohibit that, but federal law does not require that either. As the Third Circuit recognized in Santa Fe, federal law is simply silent on this point. It leaves room for manufacturers to act, but it also leaves room for states to act, and that goes to the preemption issue that Mr. Connolly will discuss on behalf of the defendants in this case. If the court stands by its analysis from McLean, Novartis' merits arguments on the extraterritoriality issue collapse. Under pork producers, the extraterritoriality doctrine only applies to laws that support it. What do you think is the controlling opinion in pork producers? With respect to extraterritoriality, it's the unanimous Part 3 of Justice Gorsuch's opinion. So the division only comes with respect to pike balancing, which I'll come back to in a couple of minutes.  Or more quickly than that. What do you think is controlling on pike balancing? So that is not clear.  That is not clear. Oh, I get that. That's why I asked the question. Our brief says that it's Justice Barrett's opinion. Having thought about the issue more, I actually think that it might be Justice Sotomayor and Justice Kagan's opinion, which does apply to pike balancing, but makes clear that it's only a rare case which can win under pike balancing. You usually have to allege an interference with the arteries of interstate commerce. And, you know, the court, the controlling opinion favorably cited the Exxon case from the Supreme Court. I think this case is very similar to that in many respects. There's no facial discrimination in SB 751. It applies to both in-state and out-of-state drug manufacturers. Well, they say there's no real manufacturing, even though we have these huge companies here. Hum. Huge companies in Missouri. You've listed them. Or somebody listed them. And I'm sure the other counsel knows of them. Even though we have these huge companies, that there's no actual manufacturing in Missouri. Is that true? That is not true, Your Honor. So I believe even... Well, is it in the record before we get too far afield here? I believe Appellant's brief concedes that a couple smaller manufacturers are headquartered in Missouri. Okay. But a lot of bigger ones have substantial research and manufacturing presences here, including Bayer, BI, Mallincroft, Pfizer, Eli Lilly. I think they're all, like, in St. Louis County. It's actually a pretty significant presence. And so the theory that even though the law does not facially discriminate, that there's some sort of disparate impact... I mean, first of all, disparate impact was rejected by the Supreme Court in the Exxon case. But it's not even really a compelling disparate impact theory. You know, I would say that Big Pharma has a lot of influence in Missouri. The Missouri legislature simply chose to prefer the hospitals and the poor consumers over the manufacturers. That's exactly the sort of choice the Supreme Court said a state could make in the Exxon case. The other thing on discrimination that I'd like to say is you have to compare apples to apples. That's the lesson of the Davis case. That's the lesson of the General Motors Corby-Tracy case. But here, there is no apples to apples comparison. The drug manufacturers do not compete with hospitals and medical providers. They don't compete. And so really, it's an apples to oranges comparison. And so under cases like General Motors Corby-Tracy, there can be no discrimination that's relevant under the Dormant Commerce Clause. And the district court got that right. Finally, on pike balancing, which we talked about a little bit, it's not entirely clear whether pike balancing is still a thing. But assuming that the Sotomayor and Kagan opinion is governing on that, we would refer the court to the Exxon case. We would also refer the court to the repeated warnings in the Pork Producers case. Does Pork Producers, does this court have a decision on pike balancing? I don't believe so. There are Dormant Commerce Clause decisions. I believe they deal with the extraterritoriality doctrine. I think that's the Ellison decision. And there's one more, but I think it's extraterritoriality. If I may briefly conclude, Your Honor. One sentence or so. Go ahead. SB 751 does not regulate prices outside of Missouri. It regulates in-state contractual arrangements. Liability only goes to the manufacturer if they fail to honor contractual obligations in-state. This is a delivery statute. It does not implicate the extraterritoriality doctrine. The state would ask the court to affirm. Thank you for your argument. Mr. Connolly. May it please the court. I'm Ronald Connolly for the Intervenors Appellees, Missouri Hospital Association and Missouri Primary Care Association. I'm going to discuss three topics, preemption and then a little bit more about pricing and replenishment. I'll start with preemption, which Ms. Ellsworth didn't address, presumably because those questions have been asked and answered by this court in Pharma v. McLean. In that case, this court held that Arkansas Act 1103, which is very similar to SB 751, does not set or enforce discount pricing. This court rejected field and obstacle preemption theories in that case. Novartis claims that it has a new theory, but that theory is not new. Their supposedly new theory is that there's an obstacle here because the Missouri law requires them to ship to an unlimited number of contract pharmacies. But that argument was presented to this court in the Pharma case. Pharma argued that there was a closed system at the federal level that prohibited states from legislating in a way that required an unlimited number of contract pharmacies. So McLean is controlling here, and it defeats Novartis' preemption claim. I'd like to talk about pricing a little bit, if I may. The Missouri statute was discussed, but not completely. The Missouri statute defines a 340B drug in part as one that is, quote, purchased by a covered entity. So at the outset, it addresses drugs that have already been purchased. And then the statute goes on to prohibit delivery of a 340B drug. So it's addressing delivery and distribution of drugs that have already been priced under the 340B program. It's not a pricing statute. It's a delivery statute. And in fact, the 340B statute entitles covered entities to purchase an unlimited number of 340B drugs. Any harm that they believe they have suffered comes at the hands of the 340B program, not the state of Missouri. The 340B statute imposes only two requirements on covered entities, no diversion and no duplicate discounts. So in other words, it's addressing who the drugs can go to once the covered entity purchases them. There's no limit on the number that they can purchase. Once they have them, they can only prescribe them to certain people. But it doesn't impose a limit on the number of purchases. And that was acknowledged by the Sanofi court in the Third Circuit that said that covered entities can buy an unlimited number of drugs for shipment to themselves or to one contract pharmacy, depending on the policy. But the point is that the pricing obligation is unlimited and is imposed by the federal government, not Missouri. Counsel, I think your co-counsel said that Ellison's in your brief. Did he say that? He did. It's not there, is it? I don't recall, honestly, Your Honor. I prepared for preemption. What's the full name of the case? Do you know the full name of the Ellison case? I don't even know that, Your Honor. I apologize. Somebody will tell me. But I didn't see the word in the brief. Association for Accessible Medicines. Oh, it has a different name. No, that's a Fourth Circuit case. So it's not in your brief. Go ahead. Proceed. So that's pricing. I'd like to talk a little bit about replenishment. The first point that is important to keep in mind is that replenishment is a federal mechanism. It's blessed by the federal government. HRSA permits contract pharmacies and covered entities to use the replenishment model. So to the extent that Novartis has a problem with how replenishment operates, it should go to the federal government. They allege that replenishment results in diversion and things of that nature. Those are claims they can bring to the federal government. Has the federal government expressly approved the I have no idea what the answer is. Has the federal government expressly approved the replenishment model? They have. Thank you. There was a declaration filed in the Sanofi case by the head of HRSA at the time discussing the replenishment model. This is a federal mechanism. It's subject to audit. Novartis can audit these claims if it wants, if it believes that an improper number of drugs are being dispensed. The way it works is that it's a matter of efficiency. One way to do this is for a pharmacy to have a shelf with only 340B drugs and a pharmacy to have a shelf with only non-340B drugs. A patient comes in and they've got to figure out which shelf to pull it from. It's inefficient. It results in waste because those 340B drugs might expire and have to go into the garbage. So it actually results in fewer purchased 340B drugs. The way replenishment works is the patient comes in, the pharmacy gives the patient the drug, and then there's a true-up after the fact where it's determined how many 340B patients came in and got a certain amount of drugs. And then there's replenishment, in essence, repaying the pharmacy for drugs that it already dispensed. Again, this is blessed by the federal government. If Novartis has a problem with that, it should go to the federal government. SB 751 doesn't mandate replenishment or any other pharmacy model. These are federal models. Any questions, Your Honors? Seeing none, thank you for your argument. Thank you very much. Your Honor, if I may, the case is on page 35 of the intervener. Well, thank you very much. Not in the index. Rather different, but it was efficient. Ms. Ellsworth, I hope that didn't trouble you. Thank you. Okay, you may proceed. Thank you, Your Honors. I'm going to try and make four very brief points with my rebuttal time. The first is I want to address this question about whether the Minnesota and Missouri laws in Ellison and here somehow are different in whether they set price. The Minnesota law did not set the dollar amount for any drug sale. What it did was it prevented a price increase by the manufacturer. So it pegged the price that it would be sold down the line in Minnesota to the company's existing price. Missouri law operates in the same way to peg the price in Missouri to something external to Missouri. Missouri law does set the dollar amount by pegging it to the 340B price. But in both cases, the state is saying when a drug is sold here, it must be at this price from some external factor, the company's existing price or the 340B price. But it is the state law that is determining that. Second, on this question about delivery versus price control, I do want to be clear here that the only aspect of a drug's delivery that is regulated by this statute is the price tag. And truly the simplest way I think to understand that is that imagine CVS opens a box. It has arrived from the distributor. It takes out a dozen vials of Novartis' drug. The only thing that might differ in the way that vial A and vial B were delivered is the price tag that was attached to it. Everything else is exactly the same. It's the same box. It's the same truck. It's the same route. Everything is the same except for the price tag. The third point I want to make is that I heard the lawyer for the hospital association say that this statute only addresses drugs that have already been bought. And it is just about delivery after they have already been bought. That absolutely has to be wrong. Because if they are right, the statute is meaningless. The federal law allows us not to sell drugs if a covered entity will not abide by a single contract pharmacy policy. And so if under federal law we have the right not to sell them, then this notion that the statute only addresses drugs that have already been brought just would be nonsensical. The last point I want to make, Your Honor, is that this court has addressed pike balancing in a case that postdates pork producers. It's the Entergy, Arkansas case that we cited in our brief. So for all of the reasons we've been discussing today, I think Ellison is the simplest and most straightforward way to see why when viewed through a dormant commerce clause lens, this statute must be enjoined. Thank you very much, Your Honors. Thank all counsel for the argument. Case number 25-1619 is submitted for decision by the court. Counsel are excused. Ms. McKee.